**Diann TATE, Individually on her own behalf as surviving spouse of Dale Tate, as Personal Representative of the Estate of Dale Tate, deceased and as natural Guardian of Jason Tazwell Tate, a minor child of Dale Tate; Brian William Tate, Individually and on his own behalf**

**as surviving child of Dale Tate; Vivian Marie Johnson, Individually on her own behalf as surviving spouse of Veltry Herman Johnson, III, deceased, and as Personal Representative of the Estate of Veltry Johnson; and Angela Wooden; Lieutenant Nancy Ann Schulz, U.S. Army, Individually and on her own behalf, Plaintiffs–Appellants,**

v.

**BOEING HELICOPTERS, an Unincorporated Division of the Boeing Company, a Delaware Corporation; Breeze–Eastern, an Unincorporated Division of Transtechnology Corporation, a Delaware Corporation, Defendants–Appellees.**

No. 96–5502.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 20, 1997.

Decided April 2, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied May 22, 1998.

---

Mark A. Rassas, Rassas & Rassas, Clarksville, TN, Francis G. Fleming, Brian J. Alexander (argued & briefed), Kreindler & Kreindler, New York City, Lucius P. Hawes, Jr., Hawes & Cameron, Hopkinsville, KY, for Plaintiffs–Appellants.

Richard L. Walter (briefed), Boehl, Stopher & Graves, Paducah, KY, Steven S. Bell (argued & briefed), Perkins Coie, Seattle, WA, Carol D. Browning (briefed), Stites & Harbison, Louisville, KY, Bruce G. Shanahan (argued & briefed), Sedgwick, Detert, Moran & Arnold, Los Angeles, CA, for Defendants–Appellees.

Before: SILER, BATCHELDER, and GIBSON,[*] Circuit Judges.

---

[*] The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

## OPINION

GIBSON, Circuit Judge.

The claims arising from the crash of a CH–47D Chinook military helicopter during a July 24, 1990, training mission at Fort Campbell, Kentucky are before us again. The district court [1] entered summary judgment on the failure to warn claims asserted by a soldier injured in the crash and the family members of three of the soldiers killed in the crash. The district court held that the government contractor defense established in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), and this court's earlier opinion in this case, *Tate v. Boeing Helicopters*, 55 F.3d 1150 (6th Cir.1995), compelled the entry of summary judgment for the defendant. We affirm the judgment of the district court.

The crew of five on the Chinook helicopter were conducting a night vision goggle training mission involving the transport of a 15,760 pound concrete block. The helicopter was traveling at approximately fifty knots just before the crash, with the concrete block suspended below the aircraft. Nancy Schultz, who was piloting, told the accident board afterward that she repeatedly activated the cargo hook mechanism but did not know if she had successfully released the block. The block was dragged along the ground eighty-five feet before it was released, and the aircraft struck the ground some 314 feet beyond where the concrete block came to rest. The facts have been stated in considerable detail in this court's earlier opinion, and we need not develop the factual background further, except as necessary to analyze the appellants' arguments.

The district court initially granted summary judgment in favor of Boeing and Breeze Eastern on all claims and dismissed the case. This court affirmed the summary judgment on the design defect claim in *Tate I*, 55 F.3d at 1156–58, but vacated and remanded on the failure to warn claim, holding that the district court had not addressed this claim. We observed that other circuits have applied the government contractor defense

against the failure to warn claims, but in doing so did not focus on the underlying design defect but instead upon the warnings. "Warning the government of dangers arising from its specific design ... does not encompass or state a failure to warn claim; it simply encourages contractors to provide the government with all the information required to soundly exercise its discretion." *Id.*

We continued that "By contrast, tort law duties to warn accomplish an entirely different objective of helping those who use or otherwise come into contact with a product to protect their own safety." *Id.* (quoting *Grispo v. Eagle–Picher Industries (In re N.Y. Asbestos)*, 897 F.2d 626, 632 (2d Cir.1990)). Thus, design defect and failure to warn claims differ practically, as well as theoretically, and approval of a design does not mean that the government considered the appropriate warnings, if any, that should accompany the product. *See id.* We squarely held that the government contractor defense to failure to warn claims is not necessarily established merely by satisfying the government contractor defense as to design defect claims. *Id* at 1157. We further reasoned that:

> When the government exercises its discretion and approves designs prepared by private contractors, it has an interest in insulating its contractors from liability for such design defects.... Similarly, when the government exercises its discretion and approves warnings intended for users, it has an interest in insulating its contractors from state failure to warn tort liability.

*Id.* (internal citations omitted.)

We then stated the *Boyle* requirements in failure to warn cases as follows:

> When state law would otherwise impose liability for a failure to warn of dangers in using military equipment, that law is displaced if the contractor can show: (1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that con-

**1.** The Honorable Edward H. Johnstone, United States District Court for the Western District of Kentucky.

formed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not.

*Id.*

We observed that the exercise of the government's discretion must transcend rubber stamping. As none of this analysis was conducted by the district court, we remanded the issue to the district court. *Id.*

We stated that on remand the district court may elect to assume arguendo that Kentucky law would impose liability under these facts, and proceed to determine the propriety of summary judgment under the contractor defense. *Id.* at 1157–58. We further stated that the parties might have developed an insufficient record on the failure to warn claim. *Id.* at 1158.

On remand, the district court, in a succinct opinion, held that "significant conflict" between federal interest and state law, as required by *Boyle,* is not a precondition for consideration of the three-element test in *Boyle. Tate v. Boeing Helicopters,* 921 F.Supp. 1562, 1564–65 (W.D.Ky.1996). The court looked to our earlier opinion in reaching this conclusion, and stated that the "significant conflict" inquiry occurs during the analysis for the first element of the *Boyle* test, whether the United States exercised its discretion and approved the warnings. *Id.*

The court observed that the plaintiffs termed their theory of causation as "sling hang-up," in that the hook system caused the dragging load to hang up on an open hook, creating too much tension in the sling for it to release, contrasting this to the statement in *Tate I* that the plaintiff's cause of action was based on "sling slack." *Id.* at 1565–66. The district court simply held that, whether it is the one or the other, the undisputed cause of the action was a failure of the tandem cargo hook system to release the cargo, and the only relevant inquiry was whether Boeing and Breeze Eastern warned of the

situation in which the hooks could fail to release. *Id.* at 1566.

The district court then considered whether the United States had exercised its discretion and approved the warnings, if any. The district court outlined the evidence on this issue in some detail, including the record concerning the substantial number of reviews and revisions of the CD–47D Operator's Manual. *Id.* at 1566–67. The district court noted that "the process for creating the new CH–47D Operator's Manual took one and a half years, even with the baseline YCH–47D Operator's Manual already in existence." *Id.* at 1567. The district court held that the approval could not be said to be rubber stamping and observed that where the government had gone beyond approval and actually determined for itself the warnings to be provided, the contract had surely satisfied the first *Tate I* condition because the government exercised its discretion. *Id.* The court further found that the contractor provided warnings that not only conformed to the approved warnings but were identical, because they were one and the same with the CH–47D Operator's Manual. *Id.* Finally, the district court held that the contractors, as a matter of law, had warned the United States of dangers of the equipment. *Id.* at 1158 (citing *Tate I,* 55 F.3d at 1156).

### I.

We review a district court's grant of summary judgment de novo. *See Brooks v. American Broadcasting Cos.,* 932 F.2d 495, 500 (6th Cir.1991). In doing so, we view the evidence in the light most favorable to the party opposing the motion. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

### II.

Plaintiffs argue that Boeing's interaction [2] with the government was insufficient to

---

**2.** Breeze–Eastern concedes that, as a subcontractor, it bases its claim to the government contractor defense largely on the communications be-

tween the prime contractor, Boeing, and the Army. Plaintiffs, however, do not dispute that a subcontractor receives the benefit of the relation-

meet any of the three conditions outlined in *Tate I.* We therefore address Boeing's compliance with each of the conditions separately.

#### A.

The first condition of the *Tate I* test requires that "the United States exercised its discretion and approved the warnings, if any." 55 F.3d at 1157. This condition is intended to closely parallel the first condition of the *Boyle* test. *See id.* When we applied the *Boyle* test to the design defect claims in this case, we held that *Boyle*'s first condition was satisfied where the government and the contractor had engaged in a "continuous back and forth" review regarding the design in question. *Id.* at 1154.

■ There is ample evidence that the Army and Boeing likewise carried out a "continuous back and forth" review process regarding the warnings contained in the CH–47D Operator's Manual. Plaintiffs contend, however, that the review process was insufficient because the Army did not expressly consider the particular hazard of "sling hang-up." Plaintiffs argue that, just as the review must relate to the design in question in a design defect case, so must the review process address the hazard or warning in question in a failure to warn case.

We are unpersuaded. A requirement that government review *focus on a particular hazard or warning at issue* is simply not analogous to a requirement that the government review focus on a particular design. In the context of design defects, when the government has reviewed and approved a design, we presume that it has weighed and accepted all the risks associated with that design choice. We do not require evidence that the government has addressed each of those hazards individually. Thus, if we were to accept the plaintiffs' argument, we would be requiring proof in the failure to warn context of that which we accept as implicit in the design defect context. This would significantly increase the government contractor's eviden-

tiary burden and would go beyond the requirements of the *Boyle* test.

■ Accordingly, we must consider the continuous back and forth review process in light of what it is supposed to establish. The first condition of the *Tate I* analysis requires only that the government exercise its discretion in approving the proposed warnings. In the failure to warn context, discretion occurs where the government is both knowledgeable and concerned about the contents of the proposed warnings before granting its approval. The government is sufficiently knowledgeable when it has a complete enough understanding of the proposed warnings to reasonably recognize which hazards have been thoroughly addressed and which have not. The government is sufficiently concerned when it demonstrates a willingness to remedy or require the remedy of any inadequacies it finds in the proposed warnings. Where government knowledge and concern are exhibited through the review process, it may be fairly said that the government has decided which warnings should and should not be provided to end users.

According to uncontested affidavit and document evidence, the Army's review of the CH–47D Operator's Manual was extensive. The development of the CH–47D Operator's Manual began in the late 1970's with the creation of draft publications for the YCH–47D prototype aircraft. Between September 1978 and the end of 1979, these draft publications were subjected to a series of "in-process" reviews by government representatives before being printed and delivered to the Army in December 1979. Among these publications was a draft version of the YCH–47D Operator's Manual. In the nine months following delivery, the YCH–47D Operator's Manual was revised no fewer than five times. In October 1980, the Army contracted with Boeing to modernize the Army's existing CH–47 aircraft to the D model configuration. As part of the contract, Boeing was obligated to prepare and deliver new manuals for the CH–47D aircraft, making maximum use of the information contained in the existing

---

ship between the prime contractor and the government. *See generally, Maguire v. Hughes Aircraft Corp.,* 912 F.2d 67 (3d Cir.1990) (applying

government contractor defense to subcontractor on basis of prime contractor's interaction with government.)

draft YCH–47D manuals. The Army held at least nine in-process reviews of the CH–47D manuals before their delivery in June 1982. During the in-process reviews, Army personnel would conduct a page by page examination and edit of the Operator's Manual.

After receiving the new manuals, the Army engaged in the process of "fielding" the CH–47D, which involved supplying the CH–47D crews with the manuals, tools, and training necessary to use the aircraft. During this time, the Army requested that crew members report any proposed changes or improvements to the CH–47D Operator's Manual. The Army met periodically with Boeing to review these and other proposed changes and revise the manual accordingly. During these reviews, the Army used personnel with experience in engineering, piloting, and the preparation of technical manuals.

The Operator's Manual contained a series of pages specifically relating to the cargo hook system. In addition to detailed descriptions of how each component of the cargo hook system functions, these pages contained warnings and cautions, including a caution addressing the problem of sling slack. Army officials carefully analyzing the Operator's Manual would had to have considered warnings and instructions about the cargo hook system.

The intensive and numerous reviews conducted by Army officials clearly transcended mere rubber stamping and indeed illustrated the Army's active involvement in the development of the Operator's Manual. The uncontroverted evidence, viewed in the light most favorable to the plaintiffs, indicates that the government was both familiar and concerned with the manual's content. Accordingly, we agree with the District Court that no genuine issue remains as to whether the government exercised its discretion in approving the warnings given to the flight crews.

**B.**

Plaintiffs further contend that Boeing did not meet the second condition of the *Tate I* analysis. Specifically, plaintiffs assert that Boeing did not conform to the military specification MIL–M–63029B(AV), which required Boeing to provide complete coverage of emergencies affecting flight, including precautions and "corrective action to be taken." We reject this argument.

Our analysis of this issue is informed by this court's earlier opinion in *Landgraf v. McDonnell Douglas Helicopter Co.*, 993 F.2d 558 (6th Cir.), *cert. denied*, 510 U.S. 993, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993). In *Landgraf*, we held that a pre-existing military specification incorporated by reference into contract for the purchase of helicopters was not a reasonably precise specification with which the military contractor had to conform. *Id.* at 564. Instead, we reasoned that, by knowingly acquiescing in the production of nonconforming helicopters, the Army had decided to treat the pre-existing military specification as a precatory statement. *Id.* The Army's decision to accept nonconforming helicopters was itself an act of government discretion and so did not undermine the application of the government contractor defense. *Id.*

In the instant case, the specification MIL–M–63029B(AV) expressed the standard by which the Army would review the warnings in the CH–47D Operator's Manual. When the Army reviewed and ultimately approved the Operator's Manual, it implicitly determined that Boeing had met that standard. The military's interpretation of its own specifications is the very type of discretionary function that the government contractor defense is meant to insulate. This court's rejection of Boeing's attempt to comply with MIL–M–63029B(AV) despite the Army's approval of the Operator's Manual would thus be inconsistent both with the purposes of the *Boyle* and *Tate I* analyses and with the reasoning in *Landgraf*.

The second condition in the *Tate I* analysis requires only that the contractor provide warnings which conform to the warnings approved by the government. *Tate I*, 55 F.3d at 1157. In this case, the Operator's Manual approved by the government was identical to the manual actually provided to the CD–40 flight crews. Therefore, Boeing has met the second condition of the *Tate I* analysis.

## C.

Plaintiffs argue that Boeing failed to meet the third condition under the *Tate I* analysis because Boeing neither warned Army pilots or publications personnel of the risk of sling hang-up nor recommended that the Army pilots be warned of the risk. Boeing responds that its Hazard Analysis adequately warned Army officials of the risks associated with sling hang-up and that the content of the Hazard Analysis itself indicates that it was reviewed by both Army pilots and publications personnel.

Under the third conditions of both the *Boyle* and *Tate I* analyses, the government contractor must show that it "warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not." *Tate I,* 55 F.3d at 1157. Applying this condition to the design defects claims in *Tate I,* we held that "the Army was aware of all the dangers of which the contractors were aware." *Id.* at 1156. Ordinarily, our inquiry would end with a reference to our earlier determination. In making that earlier determination, however, we specifically considered the risk of "sling slack" and not the separate hazard of sling hang-up. Therefore, we must consider whether the government was sufficiently informed of the risk of sling hang-up.

The parties agree that the relevant warning to the government was a portion of the Hazard Analysis prepared by Boeing and provided to Army officials. The Hazard Analysis contained a list of potential malfunctions of the Chinook helicopter. For each malfunction, Boeing provided its assessment of possible causes, hazardous effects, and the need for further precautionary measures. Among the malfunctions listed was the failure of the hooks to release their load when required. According to the Hazard Analysis, such a malfunction could occur if the forward speed of the aircraft were to cause the cargo to drag along the ground and the hook pivot system did not swing back enough for the sling to fall off the hook. Boeing classified the hazard as "catastrophic," meaning the malfunction would "cause death or severe injury of personnel or system loss." The Hazard Analysis reported that the malfunc-

tion was unlikely to occur, but that the risk could not be eliminated.

Plaintiffs contend that the Hazard Analysis did not fulfill the third condition of the *Tate I* analysis because it was provided only to Army design engineers and not to Army pilots or publications personnel. The *Tate I* analysis, however, requires that the contractor "warn the United States," not that the contractor warn specific persons within the government. *Tate I,* 55 F.3d at 1157. Of course, the warnings must be communicated to the United States in a reasonably effective manner. In this case, no one disputes that copies of the Hazard Analysis were presented to Army officials directly involved in the development of the CH–47 helicopter. As outlined above, the Hazard Analysis provided these officials with detailed information on the "sling hang-up" risk and its consequences. While the report did not recommend a warning for the "sling hang-up" risk, it referred repeatedly to the use of precautionary operator's instructions as a means of dealing with other possible hazards, thereby alerting Army officials to the possible need to share the Hazard Analysis with publications officials. We therefore conclude no reasonable jury could have found that Boeing failed to warn the United States of the relevant danger.

## III.

■ Plaintiffs maintain that, even if Boeing has met the three requirements of the test enunciated in *Tate I,* Boeing cannot successfully assert the government contractor defense because no conflict existed between the relevant military specifications and the state law failure to warn claim. We reject this argument.

■ Contrary to plaintiffs' argument, the government contractor defense is not narrowly confined to those situations where a particular military specification directly conflicts with state law. Instead, the defense applies whenever state tort liability would otherwise restrict the government's ability to exercise its discretion in military matters. This includes those situations in which the government makes the informed decision not

to include a specification or require a warning because, in the government's view, one would be unnecessary or problematic.

As this court stated in *Tate I*, "[W]hen the government exercises its discretion and approves warnings intended for users, it has an interest in insulating its contractors from state failure to warn tort liability." 55 F.3d at 1157. Therefore, once the three conditions of the *Tate I* analysis has been satisfied and government discretion has thus been established, significant conflict exists and the government contractor defense applies.

## IV.

Finally, plaintiffs argue that the district court erred in granting summary judgment without ruling on Tate's Rule 56(f) request for additional time for discovery. Plaintiffs contend generally that they needed additional time to depose government officials. Plaintiffs specifically contend that the district court should have considered the affidavit of Brigadier General James Hesson which the district court received four days before issuing its Memorandum Opinion. The district court did not mention the affidavit in its opinion.

■ We review a district court's decision to limit discovery only for an abuse of discretion resulting in substantial prejudice. *See Elvis Presley Enterprises v. Elvisly Yours, Inc.*, 936 F.2d 889, 893 (6th Cir.1991); *Emmons v. McLaughlin*, 874 F.2d 351, 356–57 (6th Cir.1989). While the district court did not expressly rule on plaintiffs' Rule 56(f) motion, it implicitly limited discovery when, subsequent to the filing of the Rule 56(f) motion, it set a deadline for the filing of supplemental briefs relating to the motions for summary judgment.

■ In this case, plaintiffs had a more than adequate opportunity to conduct discovery on the government contractor defense as it relates to the failure to warn claims. The complaint in this case, including the failure to warn claims, was filed roughly four and one-half years before the district court issued its most recent order of summary judgment. Boeing and Breeze Eastern first raised the government contractor defense over three years before the recent summary judgment.

The plaintiffs' Rule 56(f) affidavit did not in any way explain plaintiffs failure to conduct sufficient discovery within this extended time frame. For example, the affidavit cites the time-consuming process of obtaining depositions from military personnel, but the attached exhibits suggest plaintiffs did not request such depositions until December 1995. Plaintiffs appear to blame the delay in discovery on Boeing's failure to provide government documents at an earlier date. These documents, however, do not appear to have been under Boeing's exclusive control, as evidenced by the fact that the plaintiffs ultimately requested them from the government itself. In light of the considerable time period available for discovery and the insufficiency of the affidavit, we cannot conclude that the district court abused its discretion in failing to grant plaintiffs additional time.

■ As to the affidavit of General Hesson, we cannot glean from the record whether or not the district court considered the document before ruling on the motion for summary judgment. Nevertheless, we see nothing in the affidavit which would otherwise make summary judgment inappropriate. Therefore, we conclude that the district court's failure to consider the affidavit would not have substantially prejudiced the plaintiffs.

Accordingly, we affirm the district court's grant of summary judgment.